May it please the court, my name is Stephanie Adractis and I represent the appellant Anthony Hammonds, also president court as his sister and son. Hammonds was acquitted of all counts at trial except one for which he received a sentence of 25 years to life. The trial judge granted Hammonds motion for a new trial because the trial that he had was not fair. Trial counsel admitted that she was not prepared for trial and that she had not interviewed people who lived at the duplex, the Verde Street property, where the incident occurred and who could have testified at trial that Hammonds had moved out about two weeks before the charged incident. At the reporter's transcript 204 to 206, trial counsel admitted this evidence was exculpatory, it needs to be investigated, referring to recently disclosed reports concerning people who'd lived on the property. She didn't yet at that point know about the confidential informant agreed, but she said as to, generically, as to people who lived on the property, I think these people are key, they need to be interviewed. She did not do any of that investigation prior to trial. The trial judge, in ruling on the motion for a new trial, agreed. He said he specifically found that if the defense witnesses had been presented that the jury could easily have acquitted Hammonds not just of five counts, but of all the counts that were presented at trial. The child endangerment count for which he was convicted rested on a very questionable theory, and that because Hammonds lived in one of the units on the duplex property at Verde Street that he somehow must have been responsible for the chemicals in the lot shed in the child that was present in the rear unit that day. Four witnesses, at least four, could have testified at trial that Hammonds did not live there at that time, that he had moved out at least two weeks earlier, and that he only came to the duplex occasionally to visit his son. One of those people, Jennifer Reed, could have testified that she falsely told law enforcement officers that Hammonds was responsible for the drugs on the property in order to avoid going to prison herself. Trial counsel was prejudicially defective for failing to interview those witnesses prior to trial and to present their testimony. All four had been arrested at about the same time that Hammonds was, and so their whereabouts could have been ascertained and they could have been interviewed and subpoenaed. Those witnesses, and in particular Jennifer Reed, were crucial to Hammonds' defense because they would have contradicted the prosecutor's trial theory that Hammonds, because he lived at Verde Street, must have been responsible for the child and for the drugs that were present. The witnesses would have established that Hammonds did not have custody of the child, no matter who was the child's father. Under California law, for purposes of the child endangerment statute, one has custody of a child if one voluntarily undertakes that child's care, and that's in People v. Tony and People v. Perez that are cited in the briefs. Here, they're the only evidence and the only theory that the prosecutor was able to argue at the trial was that Hammonds lived at the duplex, there was circumstantial evidence that that was his son, and so he reasoned that the jury should infer that Hammonds had undertook the child's care. But in reality, the witnesses could have testified that Hammonds had only lived on the property for about one month and that he had moved out two weeks prior to when the police arrived. He was an occasional visitor to his son there. He had informal visitation with his son, and in no respect could the prosecutor have proved the crucial element of custody if those witnesses had testified. Counsel, Judge Gould with a question. Yes, Your Honor. If you could please help me out on a procedural issue. I know there was more than one motion for new trial. You described the trial judge ruling on the first motion where he granted it. My understanding was that the state court of appeals reversed that, and then there was a second motion for new trial. Now, in terms of the issues you're presenting to us, do we look at both those motions, or do we look at just the IAC allegations? Your Honor, both of the motions for a new trial raise the issue of ineffective assistance of counsel, and so the last reasoned decision as to ineffective assistance of counsel in this case for AEDPA purposes would be both of those court of appeal decisions addressing the ineffective assistance of counsel. The trial judge twice ruled on the ineffective assistance of counsel issue, in a sense, but in the first motion, he actually granted the new trial motion on grounds that the witnesses were newly discovered. It seems like the judge felt some sympathy with the defense counsel's position that a lot of information had essentially been dumped on her mid-trial, and so instead of granting the new trial motion in the first instance based on ineffective assistance, he granted it based on newly discovered evidence. Then in the second new trial motion, he essentially found that because the court of appeal had already ruled on ineffective assistance of counsel, had rejected that claim, he did not grant it in the second motion as well. Okay. Thank you. The two court of appeal opinions, which are the relevant opinions for AEDPA purposes, unreasonably applied Strickland v. Washington on a number of grounds. And one of the most important ones was that it they both reasonably placed the burden of doing pretrial investigation on Mr. Hammons instead of on his lawyer. In both opinions, and they sort of cross-quote each other, but they suggest, well, it was Hammons' fault because he didn't alert his counsel to these witnesses. And by the way, there was no evidence that Mr. Hammons did not alert his counsel to the witnesses. But they placed that constitutional duty, which is clearly established on Mr. Hammons instead of on his lawyer. And that is clearly contradictory or contradicted by Kimmelman v. Morrison, Strickland v. Washington, Williams, and Wiggins, which are all cited in the briefs. The defense counsel has an independent constitutional duty to make a reasonable decision that a particular investigation is unnecessary. In this case, counsel's comments at page 174 to about 225 of the reporter's transcript are quite telling on this because she admits, she states, I'm totally unprepared. I didn't interview these people. I didn't really know about them until I got these reports after the trial started. And so we know that counsel did not do a reasonable investigation, and we know it was because she was admittedly unprepared for trial. That's a violation of counsel's independent duty to investigate. In the opinions of the Court of Appeal, both opinions are unreasonable in that they fail to mention that it's counsel's duty, not Mr. Hammons, and they place the onus on him. Also, because counsel did not present the witnesses at trial, and that's this court's decision in Lord v. Wood and other cases, she failed to present evidence that she herself deemed was exculpatory. And if one looks at the prosecutor's closing argument, it's clear that it was. The witnesses would have clearly and flatly contradicted the prosecutor's only trial theory in this case. In cases like this, where there is a total failure to conduct a pretrial investigation, it is not possible for counsel's decision not to present those witnesses to be tactical. It's clear that it wasn't. So the Court of Appeal opinions in both instances objectively and unreasonably applied Strickland because they failed to apply that doctrine, and they essentially turned it on its head. It was also professionally unreasonable for counsel to argue that there was a lack of evidence that Hammons was connected to the property when there was circumstantial evidence that he had lived there. It was known to everyone that he had lived there temporarily. And so she was faced with this evidence that some of his things were in the duplex unit in the back, and that he had told someone that that was his address. She had no evidence to rebut that, and she could have put it on. The Court of Appeal opinion also acknowledges that the testimony of Jennifer Reed and Brian Ramsey was material to Mr. Hammons' case. So we have that finding of fact. This is material evidence. This is evidence that could have made a difference. The analysis is also objectively unreasonable in its analysis of prejudice, because it doesn't, the Court of Appeal opinion, in either instance, analyze the materiality of that testimony in the context of how weak this case was. They never mention that this case was really built on speculation. The prosecutor's closing argument focuses on things like, well, this must have been Mr. Hammons' garbage. He states that repeatedly. That it's an absurdity when one looks at the actual situation where there's a number of people living on the duplex, no indication that he was there. This case was built in the judge's terms, built on skimpy, weak, marginal evidence, and so the Court of Appeal opinion was objectively unreasonable because it failed to follow Strickland's mandate that the Court evaluate the omitted evidence in light of the evidence as a whole. The Court of Appeal also proposed two speculative and legally and factually invalid theories. In the second opinion, they did this to argue that there was sufficient evidence such that there was no prejudice, and their first theory was, well, Hammons must have been responsible for some kind of ongoing threat to his son. He was not charged with that. I've supplied the charging document with my supplemental excerpts of record. He was charged with endangering his son on this specific date, so that was an unreasonable application of the... All right. Go ahead. Use your time. Oh, I'm sorry, Your Honor. Thank you, and may it please the Court. Donald Ostertag, Deputy Attorney General for Respondent and Appellee. Initially, I'd like to point out that there's been absolutely no showing in this case by way of declaration from these people prior to trial and knew that they had beneficial information. I mean, there has to be some sort of showing here to show that defense counsel was deficient at the outset, that he knew the existence of these people, and as both the Court of Appeal for California and the District Court correctly noted, there was absolutely no indication that defense counsel even knew of these people. Well, but the argument, though, frequently, there is an obligation on the defense counsel to do a reasonable investigation. You can't be, you know, blind to the existence of eyewitnesses because you never go out and ask if there were any. So how does your argument that counsel didn't know about these people get you very far? Well, it's that he has to know, or she had to know in this instance, at least that they existed and that they had some beneficial information. You can't just hit the street running and assume that defense attorney, especially when looking at it through the deferentialized scrutiny. What is your, what do you say in response to the suggestion that she didn't, that counsel didn't make any investigation to find out about them? There was just no evidence that was presented here that these were the type of people that defense attorney would even know about. And I think, for example, a distinguishable case would be the Howard case cited by defense counsel in the reply brief, where there was a failure to even investigate the victim of the crime. Why do you say these are the type of people that you wouldn't investigate? It's just, they have to be known. They have to be known to the defense attorney. If you go out and you think, hey, we're being charged with a drug case here, we're being charged with child endangerment, let's figure out what's going on. You're not going to start interviewing these, you know, relatives and friends of the defendant in an effort to find information that he wasn't living there at the time. So were the occupants of the front and back apartments of this duplex, the names of those occupants weren't listed anywhere on the discovery? It's not that they weren't listed somewhere on the discovery, but there's no idea or no notion that defense counsel here, keep in mind we're looking at this through the deferential eye of Strickland, and determining whether defense counsel, you know, objectively failed to provide constitutionally effective representation. Even if you knew the names of these people, and that they existed in there, there's no idea that he knew of this evidence. Not one of those declarations said, I conveyed this information to defense counsel. There's no declaration from... Did defense counsel go to the police to find out who was in there with information? It's unclear from the record, and that's exactly my point, Your Honor. That you can't make these assumptions and inferences that defense counsel wasn't doing her job. In fact, you have to make the assumptions and inferences the exact opposite to that, based on Strickland. And that's exactly what the Court of Appeal here did. In any event, even assuming she did know about these people, and would have went out and interviewed them, and that was the official representation, the information that they had to provide in the declarations was going to do absolutely nothing to further the case. The reasons for that is, let's take a look at some of the inferences that were made in these declarations. One, that he didn't live there at the time of the search. It doesn't matter because, one, identical testimony was provided by Rose at trial. The jury didn't buy that, and there's absolutely no indication that by presenting the duplicative and cumulative testimony of these witnesses, that that was going to change the jury's mind. Second, there's overwhelming evidence that he did live there. He said he lived there. He held keys in his pockets to the place. You know, he's telling different people and witnesses he lived there. There's men's belongings in the back residence. Were the keys in his pocket to the apartment or to the shed? To the back shed of the duplex, where the meth lab was. Not the apartment where the son was living? Correct. The apartment address is the one he gave the police officer when he was arrested as his address, and there was also testimony from other witnesses that he said he lived there. So there is overwhelming evidence that he did live there, and in any event, even if he didn't live there, even if these witnesses came into court and the jury said, you know what, we don't think he lived there, it didn't matter, and it didn't matter for several reasons. One, there's no requirement that he lived there to endanger the child. Two, there were alternate theories in this case. One, of aiding and abetting that could have equally led to his conviction. The jury was adequately instructed on that. You know, there's just absolutely no indication that had all these witnesses come in and swayed the jury's opinion that he wasn't living there, that it would have had any effect on the case. Counsel? Yes. On this part of your argument, does it go to the prejudice prong of Strickland, or does it go to whether counsel was deficient? I'm intending to argue it in terms of prejudice, in terms that even had this investigation been conducted, had the defense attorney known of these people, and assuming that she would have made the tactical decision to call these people who did lack credibility, and that they were the relatives and friends of the defendant, that it would have had no impact on the trial. So I intend to argue that in terms of prejudice prong of Strickland. That's what I thought, but I wanted to make sure now. What did the Court of Appeals say about the prejudice issue? The Court of Appeal noted several of the factors that I just outlined, saying that there would have been no material impact on the trial had these people testified due to the overwhelming evidence that he did live there, and due to other certain facts that discredited the statements made by the declarants. Dave, thank you. What evidence at trial supported the finding of Karen Custody? Well, you have his statements that my son lived there. The only thing that was in the declarations to really take away from his statements, that that was my son, he was there, was the declaration from Hillworth, from his new girlfriend and his roommate, who he's living with now, saying that he was there with the son at the time. One, he didn't need to have Karen Custody under an aiding and abetting theory, and that was outlined by both the Court of Appeal and the District Court in this case. There's a requirement that the direct perpetrator have Karen Custody. But in any event, you have his statements that my son lived there. You have the idea that I go to the house to check on my son, that he stays there. He stops in periodically to check on his belongings and to make sure that his son is doing okay. There's all of that that supports the idea that that was his son. There's also the notion that the brother's children were two and ten. His child was five at the time, and the child that was found there was five. You have the statements from Hudson, who said that's my child at the time, which by inference is also Petitioner's child, because they only have the one child together. So there's all of this evidence showing Karen Custody, and when you even consider that it wasn't even necessary, it further diminishes Petitioner's argument in this case. An additional thing I wanted to point out, some of these other inferences that are made in the declarations, the idea that Petitioner didn't know about the drug-encrusted plate and pot that were there. Again, it doesn't matter. You have a meth lab that's right next door. He has the keys to it in his pocket. It's a situation that, as the experts testified in this case, can be very dangerous for people that are nearby. It can explode. It can let off fumes that are very dangerous to people, particularly a five-year-old child. You have the testimony or the statements from Reid in her declaration that she let a friend put things in the shed. There's absolutely no indication whatsoever as to what those things were, whether they had anything to do with the meth lab. Nothing in that declaration takes away from the fact that Petitioner knew what was in the shed. In fact, like I said, he had keys to it in his pocket when he was arrested. His own statements when he's arrested, I think, are very damning, too. When he gets arrested, he says, I knew about that. You got the right guy. Let everybody else go. He knew that there was a meth lab there. He admitted that he knew it was there. He had the keys to it in his pocket, and he knew that his five-year-old child was right there the whole time. These statements from these declarants would have done nothing to sway the jury's opinion in that regard. Unless the panel has any further questions, I'm prepared to submit. There don't appear to be any. Thank you. Thank you. Are there any further questions of Appellate's Counsel? I have none. Thank you. The case just argued is submitted for decision. We'll hear the next case, which is Williams v. Walker.
judges: Navarro, Schroeder, Gould